**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

——————————————————————

|  |  |  |
|---|---|---|
| KENNETH DAVISON, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. _____ |
| v. | ) | |
| | ) | (Electronically Filed) |
| NOVARTIS PHARMACEUTICALS | ) | |
| CORPORATION.; | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

——————————————————————

## COMPLAINT

**COMES NOW** Plaintiff, **KENNETH DAVISON,** by and through undersigned counsel, and hereby brings this action for damages against Defendant, Novartis Pharmaceuticals Corporation, and alleges as follows:

## INTRODUCTION

1.     This is an action for damages due to Plaintiff relating to Defendant's development, testing, manufacture, packaging, preparation, labeling, marketing, supply and/or sale of the dangerous and defective pharmaceutical product Beovu®.

2.     Defendant misrepresented that Beovu was a safe and effective treatment for age-related macular degeneration when in fact the drug causes serious

medical problems including retinal vasculitis, retinal vascular occlusion, and related sequelae.

3.      Defendant failed to warn physicians and the public about Beovu's propensity to cause vision related adverse events including, but not limited to, retinal vasculitis, retinal vascular occlusion, and related sequelae.

4.      Consumers and physicians alike have been misled about Beovu's safety and efficacy, and as a result consumers, including Plaintiff, have suffered serious and permanent eye injuries including retinal vasculitis, retinal vascular occlusion, and related sequelae.

## PARTIES

5.      Plaintiff, Kenneth Davison is and was at all times relevant hereto, a resident of Hillsborough County, Florida. Plaintiff used Beovu, and was treated for his Beovu related injuries, in this judicial District.

6.      Defendant, Novartis Pharmaceuticals Corporation, a subsidiary of Novartis AG, is and was at all times relevant hereto, a corporation organized under the laws of the State of Delaware with its principal place of business at One Health Plaza, East Hanover, New Jersey 07936. Defendant, Novartis Pharmaceuticals Corporation is the current sponsor of the Biologics License Application for Beovu, and thus maintains primary responsibility and control over the drug and all activities and materials relating thereto. Upon information and belief, Defendant, Novartis

Pharmaceuticals Corporation has also been substantively involved in the design, funding, authoring, conduct and/or publication of medical research related to Beovu.

7.      Defendants, Novartis Pharmaceuticals Corporation shall hereinafter be referred to as "Defendant" or "Novartis".

8.      At all times relevant here, Defendant has been engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Beovu, and controlling the Investigational New Drug Application and Biologics License Application for Beovu.

9.      At all times relevant hereto, Defendant was engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and or introducing into interstate commerce throughout the United States, and in the state of Florida either directly or indirectly, through third-parties, subsidiaries and/or related entities, the pharmaceutical product Beovu.

## **JURISDICTION & VENUE**

10.      The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs and complete diversity of citizenship exists between the parties.

11.     Venue in this Court is proper pursuant to 28 U.S.C § 1391 in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendant is subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

12.     This action is for damages brought on behalf of Plaintiff, Kenneth Davison, who was prescribed and supplied with and who has taken the prescription drug Beovu, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, or otherwise placed in the stream of commerce by Defendant.

13.     Plaintiff was prescribed and injected with Beovu on January 7, 2020, February 11, 2020, and April 8, 2020. After the injection on April 8, 2020, Plaintiff developed and was diagnosed with branch retinal artery occlusion and other related sequelae. Prior to using Beovu, Plaintiff had been prescribed and used other anti-VEGF therapies without incurring any material side effects.

14.     Plaintiff, Kenneth Davison, brings this action against Defendant to recover damages for the injuries suffered as a result of his ingestion of Beovu and to recover for his individual economic and non-economic damages which he sustained as a result therefrom.

15.     Defendant's    wrongful    acts,    omissions,    and    fraudulent misrepresentations caused Plaintiff's injuries and damages.

16.     At all times relevant, Defendant was engaged in the business of researching,   licensing,   designing,   formulating,   compounding,   testing, manufacturing,  producing,  processing,  assembling,  inspecting,  distributing, marketing,  labeling,  promoting,  packaging  and/or  advertising  for  sale  the prescription drug Beovu for use by physicians in treating their patients, including Plaintiff.

17.     At all times relevant, Defendant was authorized to do business within Plaintiff's state of residence and did conduct such business.

18.     At times relevant, the officers and directors of Defendant participated in, authorized, and directed the production and promotion of Beovu when they knew, or with the exercise of reasonable care should have known, of the hazards and  dangerous  propensities  of  Beovu  and  thereby  actively  participated  in  the tortious conduct which resulted in the injuries suffered by Plaintiff discussed herein.

## FACTS COMMON TO ALL COUNTS

19.     Beovu® (brolucizumab) is a human vascular endothelial growth factor ("VEGF") inhibitor indicated for the treatment of Neovascular (Wet) Age-Related Macular Degeneration ("AMD" or "nAMD") in adults.

20.    Wet AMD, also referred to as exudative AMD ("eAMD"), is characterized by the presence of choroidal neovascularization, a pathologic form of angiogenesis that results in the leakage and accumulation of fluid within the retina. In general, the primary goal of treatment for wet AMD is to maintain visual acuity, which requires drying the retina through the inhibition of new blood vessel growth and reduction of fluid leakage.

21.    The Beovu molecule, formerly known as ESBA1800 and/or RTH258, was originally developed by Switzerland-based ESBATech AG. ESBATech AG was acquired by Alcon, Inc. in September 2009, after which Alcon, Inc. and its subsidiaries, including Alcon Research, LLC f/k/a Alcon Research, Ltd., assumed ownership and all future marketing rights to Beovu. Novartis Pharmaceuticals Corporation subsequently acquired Alcon, Inc. in April 2011, and with it, ownership and all future marketing rights to Beovu. During the premarketing development process, Beovu was regulated under Investigational New Drug Application number 112023 in the United States.

22.    Novartis announced that the United States Food and Drug Administration ("FDA") accepted the Biologics License Application ("BLA") for Beovu on April 15, 2019. At that time, Novartis noted that it had used a priority review voucher to expedite review of Beovu in the U.S. in order to "make brolucizumab available as quickly as possible". This is despite the fact that safe and

efficacious drugs for the treatment of wet AMD were already on the market in the United States.

23.     Beovu received FDA approval on October 7, 2019, under BLA number 761125.

24.     Approval of Beovu was based on the results of two prospective, randomized, double-blind, multicenter Phase III studies, HAWK (NCT02307682) and HARRIER (NCT02434328), which, based on the data as characterized to the FDA by Defendants, met the primary endpoint of non-inferiority to aflibercept in mean change in best-corrected visual acuity ("BCVA") from baseline to week 48.

25.     Beovu is administered as an intravitreal injection and is intended to treat AMD by inhibiting the binding of VEGF to the VEGFR1 and VEGFR2 receptors, thereby suppressing the growth of abnormal blood vessels and reducing the potential for fluid leakage into the retina.

26.     Beovu is the third VEGF inhibitor to receive FDA approval for the treatment of wet AMD. Other VEGF inhibitors approved for the treatment of wet AMD include Lucentis® (ranibizumab) by Genentech, which was approved June 30, 2006, and Eylea® (aflibercept) by Regeneron Pharmaceuticals, which was approved November 18, 2011. Unlike Beovu, Lucentis and Eylea "have been well established as effective and safe anti-VEGF therapies for nAMD."

27.     Although not approved by the FDA for this indication, Avastin® (bevacizumab) by Genentech is another VEGF inhibitor routinely utilized by ophthalmologists in the treatment of wet AMD. Avastin has been on the market since February 26, 2004.

28.     Clinical treatment guidelines published by the American Academy of Ophthalmology currently state "intravitreal injection therapy using anti-vascular endothelial growth factor (VEGF) agents (e.g., aflibercept, bevacizumab, and ranibizumab) is the most effective way to manage neovascular AMD and represents the first line of treatment."

29.     Novartis sought to acquire and develop a new drug for the treatment of wet AMD that they could promote as requiring less frequent injections than other VEGF inhibitors. This would be accomplished by creating a drug composed of a smaller molecule that would allow for delivery of a greater molar dose with more effective tissue penetration and greater durability, thereby allowing for longer intervals between injections.

30.     According to the published article titled *Retinal vasculitis and intraocular inflammation after intravitreal injection of brolucizumab* by Baumal et al., Beovu's "molecular mass of 26 kDa is less than that of other commercially available anti-VEGF agents, allowing for a higher molar concentration with potential for greater anti-VEGF therapeutic performance per intravitreal injection.

Increased molar concentration combined with a high binding affinity for VEGF have been postulated to account for its potential for increased durability, and brolucizumab is the first agent in this class approved for a dosing interval range of 8 to 12 weeks after 3 loading doses."

31.    The instant matter involves injuries of retinal vasculitis, retinal vascular occlusion, and other acute eye injuries associated with the administration of Beovu.

32.    Retinal vasculitis is characterized by inflammation of the vessels of the retina typically leading to a decrease in vision. Retinal vasculitis can lead to retinal vascular occlusion and/or retinal artery occlusion. Retinal vascular occlusion is characterized by an obstruction of the venous or arterial system of the retina, usually by a thrombus or embolus, causing vision loss which can be severe and permanent. If the occlusion occurs in the veins of the retina, the occlusion is referred to as a retinal vein occlusion. If the occlusion occurs in the arteries of the retina, the occlusion is referred to as a retinal artery occlusion. Herein the term "retinal vascular occlusion" is used to refer to occlusions of either the arteries or the veins in the retina.

33.    Retinal vasculitis and retinal vascular occlusion are injuries unique to Beovu use. These injuries have been widely reported in patients taking Beovu but are not considered to be a risk with other VEGF inhibitors.

34.     On February 23, 2020, the American Society of Retina Specialists ("ASRS") issued an alert to its members in which it noted that it had received 14 reported cases of vasculitis following Beovu injections, 11 of which were designated as occlusive retinal vasculitis.

35.     On March 30, 2020, ASRS issued an update noting the number of cases of retinal vasculitis following intravitreal injections of Beovu it had received had risen to 25, with 21 such cases involving retinal occlusion.

36.     Subsequent to the first ASRS communication in February 2020, Novartis announced it was "conducting a comprehensive review of a limited number of reported cases of severe vision loss, inflammation and potential retinal vasculitis in patients treated with Beovu" and that it would commission an external Safety Review Committee to conduct safety evaluations for Beovu.

37.     Following their review of safety data, on April 8, 2020, Novartis confirmed the existence of a safety signal involving rare adverse events of "retinal vasculitis and/or retinal vascular occlusion that may result in severe vision loss" for Beovu.

38.     Following its confirmation of a safety signal, Novartis revised the United States product labeling for Beovu on June 9, 2020 to include a new warning regarding the risk of "Retinal Vasculitis and/or Retinal Vascular Occlusion" (§5.2), which reads as follows:

10

Retinal vasculitis and/or retinal vascular occlusion, typically in the presence of intraocular inflammation, have been reported with the use of BEOVU [*see Contraindications (4.2) and Adverse Reactions (6.1)*]. Patients should be instructed to report any change in vision without delay.

39.     It is yet unclear when this new warning was widely disseminated to physicians utilizing Beovu with their patients.

40.     Prior to June 2020, no warnings regarding the risk of retinal vasculitis or retinal vascular occlusion were present in the United States product labeling for Beovu.

41.     Data further supporting the causal relationship between administration of Beovu and retinal vasculitis and retinal vascular occlusion injuries have been documented in the peer-reviewed medical literature. Several publications have detailed these adverse health outcomes following Beovu administration since its approval in 2019.

42.     For example, in a publication titled *Retinal vasculitis and intraocular inflammation after intravitreal injection of brolucizumab,* Baumal et al. presented a retrospective case series of retinal vasculitis and intraocular inflammation in 15 eyes from 12 patients following administration of Beovu. All eyes had received previous intravitreal injections of one or more anti-VEGF agents including aflibercept, bevacizumab, and ranibizumab. The diagnosis of retinal vasculitis and intraocular inflammation in this series was made at a mean of 35.5 days (range 14-56 days) in

10 eyes after receiving the first Beovu injection and 20 days (range 7-25 days) in five eyes after receiving more than one Beovu injection. The most severely affected eyes in the series featured occlusion of larger retinal arteries at the optic nerve or branches proximal to the fovea and demonstrated severe visual loss at 20/200 or worse when vasculitis was diagnosed and showed limited improvement at the most recent follow-up. Authors noted that a history of recent Beovu intravitreal injection combined with examination demonstrating the spectrum of features observed in the case series likely rules out a systemic event, which otherwise could occur in this age group. Baumal and colleagues found that "retinal vasculitis after brolucizumab was typically occlusive and could involve the retinal arteries, veins, and potentially capillaries, with a range in the severity of findings" and declared, "Brolucizumab is the first FDA-approved anti-VEGF agent associated with noninfectious retinal vasculitis after intravitreal therapy".

43.    In another retrospective case series by the ASRS Research and Safety in Therapeutics ("ReST") Committee titled *Occlusive retinal vasculitis following intravitreal brolucizumab*, Witkin et al. analyzed the characteristics of 26 post-marketing cases of retinal vasculitis following intravitreal Beovu administration in 25 patients which were reported to ASRS through April 1, 2020. In this study, retinal vasculitis presented after one Beovu injection in 11 (42%) eyes, after two injections in 11 (42%) eyes, and after three injections in four (16%) eyes. Authors

noted that 22 (85%) eyes were reported by the treating physician as having occlusive vasculitis, with a mean time to presentation of 26 days (range, 3-63 days) from the most recent Beovu injection, and 46 days (range, 15-146 days) from the first Beovu injection. All patients had previously been treated with other anti-VEGF agents with no history of anti-VEGF-associated inflammation, and no Beovu injections were given in the presence of intraocular inflammation according to the reporting physicians. Of note, 20 (77%) patients included in this case series were stated to have switched from other VEGF inhibitors to Beovu for the purpose of "Extend[ing] treatment interval", consistent with Novartis' marketing efforts. Authors also noted that they found no identifiable associations with product lot numbers, as these events were reported with Beovu from eight different lots administered by 20 different physicians and expressed that there was no indication of an association with any ocular disorders, autoimmune diseases, drug allergies, or other medical disorders, ruling out alternative causation.

44.    Despite the clear risk of post-injection retinal vasculitis and vascular occlusion, the 13-member ReST Committee, five of whom have stock ownership in, receive fees or research support from, or serve as consultants to Novartis, did not recommend against continued use of Beovu. However, they did advise, "Because of the potentially severe nature of the consequences of retinal vasculitis secondary to brolucizumab, caution is advised when considering injection of

brolucizumab in monocular patients or when bilateral injections are being contemplated".

45.    Case reports describing patients who experienced retinal vasculitis and/or retinal vascular occlusive events following intravitreal administration of Beovu have also been published in the peer-reviewed medical literature.

46.    In an article titled *Retinal arterial occlusive vasculitis following intravitreal brolucizumab administration*, Haug et al. presented a published report of vascular occlusion with vasculitis after intravitreal injection of Beovu for wet AMD. The patient, who had received multiple intravitreal ranibizumab treatments previously in both eyes without complication, reported loss of vision with light sensitivity in both eyes four weeks after bilateral intravitreal Beovu injection. After excluding other potential etiologies, and given the temporal relationship with administration of Beovu, the patient in this case was diagnosed with "possible delayed or type IV hypersensitivity to brolucizumab".

47.    In a publication titled *Severe vision loss secondary to retinal arteriolar occlusion after multiple intravitreal brolucizumab administrations*, Jain et al. reported on a patient who presented with sudden blurry vision and floaters without pain or redness following her third injection of Beovu. The patient had previously received treatment with bevacizumab, ranibizumab, and aflibercept without incident. Upon examination the patient was found to have multiple retinal

arteriolar occlusions which caused "severe loss of vision". After a thorough work-up and exclusion of other potential causal factors, the patient was ultimately diagnosed with "retinal arteriolar occlusion associated with repeated intravitreal brolucizumab administrations".

48.     In a publication titled *Retinal Vasculitis After Administration of Brolucizumab Resulting in Severe Loss of Visual Acuity*, Kondapalli et al. reported on a patient who experienced immediate blurry vision with clinically-significant boxcarring of the retinal arteries following her second injection of Beovu. This patient had previously been treated with bevacizumab and aflibercept without experiencing any intraocular inflammation or other complications. The patient was noted to have no visual improvement at her most recent follow-up, approximately five weeks post-injection. Fungal and viral etiologies were ruled out, and the patient was diagnosed with "occlusive retinal vasculitis associated with intravitreal administration of brolucizumab in the setting of neovascular age-related macular degeneration".

49.     In a publication titled *Brolucizumab-related retinal vasculitis with exacerbation following ranibizumab retreatment: A clinicopathologic case study*, Iyer et al. described a case involving a patient who was found to have retinal vasculitis and intraocular inflammation after presenting with pain, ocular aches, floaters and decreased visual acuity one week following her third injection of

Beovu. As with other reports, this patient had previously received regular intravitreal treatments with bevacizumab, aflibercept, and ranibizumab without incident. In discussing the matter, authors commented, "Retinal occlusive vasculitis with intraocular inflammation has been a devastating adverse event for brolucizumab, leading to blinding visual outcomes for many patients. Although intraocular inflammation has been seen with other anti-VEGF medications, severe vision loss due to retinal occlusive vasculitis has not been reported."

50.    Based on the significant safety issue related to retinal vasculitis and retinal vascular occlusion, Rosenfeld & Browning explained in their recent editorial titled *Is This a 737 Max Moment for Brolucizumab?,* "[w]e have stopped using brolucizumab because of the associated inflammation. Our patients have alternatives without incurring this risk". Making note of the unusual nature of the inflammation in that it is associated with "occlusive vasculitis and irreversible severe vision loss", they pointed out that "[t]he retinal community had not reported this type of vision-threatening occlusive retinal vasculitis after intravitreal injections of other commonly used anti-VEGF drugs". Finally, the authors stressed, "[I]t is our view that intravitreal injections of brolucizumab should stop. Brolucizumab is not the only drug that can be used for the treatment of eAMD. In the face of the known risk, its use is unwarranted."

51.     In response to the Rosenfeld & Browning editorial, Kayath & Sauer (two Novartis employees) used a public platform to attempt to defend Novartis' handling of the matter and made clear that Novartis did not appreciate independent ophthalmologists shedding light on the undisclosed safety issues with Beovu and advising against its further use. The authors noted, "we believe the choice of treatment should ultimately be left to individual treating physicians and their patients, after appropriate evaluation of the benefit-risk profile of the product" and "[a]t Novartis, we support individual physicians, who we believe, whether or not they choose to use brolucizumab, are able to make the best treatment choices for their patients". At no point in this published response did these Novartis employees take responsibility or apologize for their failure to present accurate data concerning adverse events in clinical trials or for putting patients at risk for severe vision loss that otherwise could have been prevented had they not been exposed to Beovu.

52.     Rosenfeld & Browning subsequently issued a reply criticizing the published response letter by Kayath & Sauer. The authors pointed out that "Their letter fails to disclose the recent clarifications in the HAWK and HARRIER trial data, and by doing so they fail to reveal the true risks and benefits for the patients who might be given brolucizumab". Noting that the external Safety Review Committee found that incidences of retinal vasculitis and retinal vascular occlusion were higher in the HAWK and HARRIER trials than previously reported, Rosenfeld & Browning

commented, "[t]hese data, and the discrepancy from the previously released results, in addition to the cases arising from the community use of brolucizumab, raise red flags". In response to Novartis' contention that the overall rate of vision loss was comparable between Beovu and aflibercept groups in the clinical trials, the authors noted that "this comparison is flawed", and such an assessment must instead be "based on the risk of vision loss from the drug and not from the natural history of disease progression after anti–vascular endothelial growth factor injections". Mirroring their statements in the original editorial, Rosenfeld & Browning commented "we believe that the benefits of brolucizumab are not worth the risks compared with similarly effective therapies that do not have the same risk of an occlusive vasculitis" and stated "we reiterate our recommendation that a moratorium be imposed on the use of brolucizumab until the cause is discovered for these inflammatory side effects and until remedies are devised". The authors finally declared, "It comes down to a simple question for Novartis and the vitreoretinal community: how many more patients need to lose vision before this moratorium is implemented?"

53.     Echoing the concerns expressed by Rosenfeld & Browning, other retinal practices have also made the decision not to use Beovu in light of the significant safety issues involving retinal vasculitis and retinal vascular occlusion. For example, California-based The Retina Partners explained in a recent article,

"Given that other safe and effective therapies exist for neovascular AMD, and that we currently have no way of predicting who will be affected by occlusive vasculitis, we have elected to avoid Beovu until safety can be demonstrated". They further noted, "many retina specialists, including our group, believe that odds of 1 in 50 that an injection could result in vascular occlusion is unacceptable – especially when some of these patients will end up with severely and permanently reduced visual acuity, and/or scotoma".

54.     Researchers have identified biologically plausible mechanisms though which Beovu can cause retinal vasculitis and/or retinal vascular occlusion events.

55.     Various mechanisms have been proposed, including that the pathogenic mechanism involves the formation of local antibodies, or patient factors such as prior anti-VEGF treatment use, human leukocyte antigens, immune status, and causative comorbidities are potential culprits.

56.     According to Novartis, "The proprietary innovative structure results in a small molecule (26 kDa) with potent inhibition of, and high affinity to, all VEGF-A isoforms. Beovu is engineered to deliver a high concentration of drug, thus providing more active binding agents."

57.     Given these unique attributes, researchers have proposed that the distinct molecular structure of Beovu is responsible for the events of retinal vasculitis and retinal vascular occlusion. As noted by Jain et al. in *Severe vision loss*

*secondary to retinal arteriolar occlusion after multiple intravitreal brolucizumab administrations*, "[i]t could be theorized that the observed adverse event is attributed to the more potent VEGF blockade, owing to the properties of the brolucizumab molecule." Similarly, in *Occlusive retinal vasculitis following intravitreal brolucizumab,* Witkin et al. stated "[i]t is possible that because of its more potent anti-VEGF effect, brolucizumab may have a high enough anti-VEGF effect to cause retinal arteriolar constriction and occlusive vasculopathy compared with other anti-VEGF agents."

58.     In a publication titled *Brolucizumab-related retinal vasculitis with exacerbation following ranibizumab retreatment: A clinicopathologic case study*, Iyer et al. also discussed the potential for the unique characteristics of Beovu to confer greater immunological effects than other VEGF inhibitor products, as they postulated "Brolucizumab may be more immunogenic than other anti-VEGF agents by virtue of its relative small size and consequent ability to unfold which exposes epitopes that may not be recognized by the immune system. Alternatively during the post-translational modification process of protein fragments like brolucizumab, structural changes such as cleavage and cross-linking of the protein may result in the creation of new protein epitopes. These new protein structures could lead to formation of aggregates, which can significantly enhance immunogenicity."

59.     Researchers have also proposed that the retinal vasculitis and/or retinal vascular occlusion observed following exposure to Beovu is potentially a result of a type III or type IV hypersensitivity reaction.

60.     A hypersensitivity reaction is an inappropriate or over-reactive immune response to an antigen resulting in undesirable effects in the human body. In a type III hypersensitivity reaction, an abnormal immune response is mediated by the formation of antigen-antibody aggregates called immune complexes, which can precipitate in various tissues and trigger the classical complement pathway. Complement activation leads to the recruitment of inflammatory cells that release lysosomal enzymes and free radicals at the site of immune complexes, causing tissue damage. A type IV hypersensitivity reaction, also referred to as a delayed hypersensitivity reaction because it takes more than 12 hours to develop, is mediated by T cells that provoke an inflammatory reaction against exogenous or endogenous antigens. After antigen exposure, an initial local immune and inflammatory response occurs that attracts leukocytes. Then the antigen, engulfed by macrophages and monocytes, is presented to T cells, which then becomes sensitized and activated. Type IV drug hypersensitivity occurs when various drug particles bind to a T cell receptor, even if not metabolized by antigen-presenting cells or presented by major histocompatibility complex molecules.

61.    Pathologic findings in patients presenting with retinal vasculitis and/or retinal vascular occlusion following Beovu administration that support the plausibility of a type III or type IV delayed hypersensitivity reaction include the presence of anti-drug antibodies and elevated T cells and B cells.

62.    According to Iyer et al., "Among findings favoring type III hypersensitivity are frequent demonstration of anti-drug antibodies in the Hawk and Harrier trials, delayed onset retinal vasculitis, and some clinical overlap with hemorrhagic occlusive retinal vasculitis which is also postulated to involve type III hypersensitivity." The case reported by Iyer and colleagues also demonstrated the presence of both T cells and B cells in vitreous sample staining.

63.    Regarding the Phase III clinical trials for Beovu, the FDA also found, "Among subjects with treatment-emergent antibodies, a higher number of intraocular inflammation events were observed".

64.    Novartis has also commented on anti-drug antibodies observed during clinical trials, noting "In a post-hoc unmasked assessment of the Phase III HAWK and HARRIER data, there was an observed trend toward increased incidence of [retinal vasculitis and/or retinal vascular occlusion] in patients with treatment emergent (boosted/induced) anti-drug antibodies (ADAs)".

65.    Beovu is a monoclonal antibody, which are complex, laboratory-made proteins that mimic the body's immune system in order to fight off infections or

suppress disease processes and may cause immunogenicity. As pointed out by Sharma et al. in their publication *Brolucizumab and immunogenicity*, "Type III hypersensitivity reactions (HSR) to the [monoclonal antibodies] including anti-VEGF agents used for oncological indications have been reported to cause vasculitis".

66.     Consistent with the large and growing body of evidence demonstrating a causal relationship between Beovu and retinal vasculitis and retinal vascular occlusion, and that Beovu confers a greater risk of vision-threatening inflammatory adverse effects than alternative anti-VEGF treatments, Novartis has itself admitted to such an association. In a Novartis-funded and authored review titled *Brolucizumab: evolution through preclinical and clinical studies and the implications for the management of neovascular age-related macular degeneration*, Nguyen et al. admit to the causal relationship between Beovu and the injuries complained of herein, stating, "Amidst the reports of ocular inflammation, including occlusive retinal vasculitis with significant visual loss, ***that is associated with brolucizumab administration*** in eyes with neovascular AMD" (emphasis added).

67.     As FDA has made clear in its Guidance for Industry, even a single well-documented post-marketing adverse event report can constitute a safety signal

requiring action by the manufacturer, including a potential label change, particularly if the report involves an event that is extremely rare in the absence of drug use.

68.   Retinal vasculitis and retinal vascular occlusion are adverse events that occur extremely rarely in the absence of drug use.

69.   Post-marketing adverse event reports related to retinal vasculitis and retinal vascular occlusion began flowing into Novartis almost immediately after Beovu came on the market.

70.   On or before November 13, 2019, Novartis received a report of retinal vascular occlusion in a patient taking Beovu. The report was made by a physician and the injuries were noted to be both serious and resulting in disability to the patient.

71.   On or before November 14, 2019, Novartis received a report of retinal vasculitis in a patient taking Beovu. The report was made by a physician and the injuries were noted to be both serious and resulting in a hospitalization by the patient.

72.   In December 2019, Novartis received 2 additional reports of retinal vasculitis in patients taking Beovu. These reports were received by Novartis on or before December 11th and December 30th.

73.   In January 2020, Novartis received 8 additional reports of retinal vasculitis and/or retinal vascular occlusion in patients taking Beovu. 6 of these

reports were received by Novartis on or before January 3, 2020 with the remaining two reports being received by Novartis on or before January 23rd and January 30th respectively.

74.     In February 2020, Novartis received 39 additional reports of retinal vasculitis, and/or retinal vascular occlusion in patients taking Beovu. 15 of these 39 reports were received by Novartis on or before February 15, 2020. In March 2020, Novartis received 72 additional reports of retinal vasculitis and/or retinal vascular occlusion in patients taking Beovu.

75.     In April 2020, Novartis received 33 additional reports of retinal vasculitis and/or retinal vascular occlusion in patients taking Beovu.

76.     In May 2020, Novartis received 18 additional reports of retinal vasculitis and/or retinal vascular occlusion in patients taking Beovu.

77.     The numbers that have been reported, although based on well-established reporting principles, likely significantly underestimate the true number of these events occurring in Beovu users. Further, as specifically noted by Mones et al. in their publication regarding Beovu-related retinal vasculitis and retinal vascular occlusion, when it comes to postmarketing adverse event data, there is a "considerable possibility of underreporting".

78.     As a direct and proximate result of the dangerous and defective nature of Beovu as described herein, Plaintiff suffered severe bodily injury, and resulting

pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and treatment. The losses are permanent and Plaintiff will continue to suffer such losses in the future.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

79.     Plaintiff incorporates by reference paragraphs one through 78 as though fully set forth herein.

80.     At all times relevant hereto, Beovu was defective and unreasonably dangerous when it left the possession of Defendant in that it failed to contain warnings of an adequate or sufficient nature as to alert consumers and physicians, including Plaintiff and Plaintiff's healthcare providers, to the dangerous risks associated therewith, including, but not limited, to its propensity to cause serious and permanent eye injuries including those which Plaintiff sustained. These risks and dangers were known and/or reasonably knowable by Defendant prior to and during the time which Plaintiff was prescribed and ingested Beovu.

81.     At all times relevant hereto, Defendant failed to provide sufficient warnings and instructions that would have put the general public, including Plaintiff and Plaintiff's physicians, on notice of the dangers and adverse effects caused by ingestion of Beovu, including, but not limited to retinal vasculitis, retinal vascular occlusion, and related sequelae.

82.    Defendant failed to provide warnings of such risks and dangers to Plaintiff and Plaintiff's healthcare providers as described herein, and further, concealed the known risks and dangers and failed to warn of known or scientifically knowable risks and dangers associated with Beovu from patients, the medical community, and consumers, including Plaintiff, and Plaintiff's healthcare providers.

83.    Plaintiff was prescribed and did ingest Beovu in a manner consistent with and as intended by Defendant.

84.    Ordinary patients and consumers, such as Plaintiff, could not have discovered or recognized any relevant potential risks and dangerous defects in Beovu through the exercise of reasonable care within their capacity.

85.    Defendant, as an entity materially involved in the development, testing, manufacture, sale and/or distribution of Beovu, is held to the level of knowledge of an expert in the field.

86.    Plaintiff individually, and through his prescribing physician, reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

87.    Despite its possession of knowledge regarding these risks and its duty to adequately warn of severe and dangerous adverse events associated with use of Beovu, Defendant failed to properly warn the medical community and consumers, including Plaintiff and Plaintiff's healthcare providers, that use of Beovu was

associated with an increased risk of serious vision problems including retinal vasculitis, retinal vascular occlusion, and related sequelae.

88.     Beovu was designed, manufactured, distributed, sold and/or supplied by Defendant, and was marketed while defective due to inadequate warnings, instructions, labeling and/or inadequate testing in light of Defendant's knowledge of Beovu's innate risks and dangers and attributable serious vision related adverse events.

89.     At all times up to the present, Defendant has failed to properly warn of the risk of serious vision problems including retinal vasculitis, retinal vascular occlusion, and related sequelae. No warning concerning retinal vasculitis or retinal vascular occlusion was contained in the product labeling prior to Plaintiff's use of Beovu and subsequent diagnosis with branch retinal artery occlusion, a form of retinal vascular occlusion.

90.     The only information contained on these conditions prior to June 2020, which could be found in the "Clinical Trials Experience" section of the label was inadequate and otherwise false and misleading because it failed to convey and still fails to convey the absolute risk of retinal vasculitis or retinal vascular occlusion from the Beovu clinical trials. The numbers conveyed in this section to this date reflect that 1% of clinical trial patients experienced these injuries while the number is and has always been at least 3.3%.

91.     The product labeling for Beovu has at all times also failed to reflect that the clinical trials for Beovu demonstrated a 2,312% increased relative risk of retinal vasculitis or retinal vascular occlusion in Beovu users as compared to those patients that used the active control (aflibercept) in the clinical trials.

92.     Defendant had a post-sale duty to timely warn physicians including Plaintiff's healthcare providers, and consumers, such as Plaintiffs, about the potential risks and complications associated with use of Beovu.

93.     As a direct and proximate result of the dangerous and defective nature of Beovu, Plaintiff suffered branch retinal artery occlusion and other serious eye injuries, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, and medical treatment. The losses are permanent and the Plaintiff will continue to suffer the losses in the future.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

94.     Plaintiff incorporates by reference paragraphs one through 78 as though fully set forth herein.

95.     At all times relevant hereto, Defendant was under a duty to exercise reasonable care in advertising, analyzing, assembling, compounding, designing, developing, distributing, formulating, inspecting, labeling, manufacturing,

marketing, packing, producing, promoting, processing, researching, selling, and testing Beovu to ensure that use of Beovu did not result in avoidable injuries.

96.    At all times relevant hereto, Defendant owed a duty to consumers, physicians, and the general public to assess, manage, and communicate the risks, dangers, and adverse effects of Beovu, and to warn consumers and the medical community, including Plaintiff and Plaintiff's healthcare providers, of those risks, dangers, and adverse effects.

97.    Defendant's duties include, but are not limited to, carefully and properly advertising, analyzing, assembling, compounding, designing, developing, distributing, formulating, inspecting, labeling, manufacturing, marketing, packing, producing, promoting, processing, researching, selling, and testing Beovu, which was placed in the stream of commerce, and providing adequate information regarding the appropriate use of Beovu.

98.    Defendant negligently breached the above-described duties to Plaintiff by committing negligent acts and/or omissions, including, but not limited to the following:

  a. failing in their obligation to provide consumers and the medical community, including Plaintiff and Plaintiff's healthcare providers, with accurate, adequate and clinically relevant information, data and warnings regarding the adverse health risks associated with use of Beovu, and/or that there existed safer alternative pharmaceutical drugs to treat AMD;

b. failing to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, adverse vision-related events and/or reactions, including, but not limited to an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae associated with use of Beovu;

c. failing to review all medical literature regarding Beovu and failing to report data regarding the adequacy and/or accuracy of its warnings, efficacy, or safety of Beovu;

d. failing to disclose the results of the testing and other information in their possession regarding the potential for Beovu to cause vision-related adverse events including, but not limited to, an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae;

e. representing that Beovu was safe for use when, in fact, Defendant knew or should have known that it was unsafe for use and that Beovu use was associated with vision-related events and/or reactions, including, but not limited to an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae;

f. promoting and marketing Beovu for use despite the fact that Defendant knew or should have known that Beovu use was associated with vision-related adverse events and/or reactions, including, but not limited to an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae;

g. promoting and marketing Beovu as safe and effective for use when, in fact, it was unsafe, especially as compared to other available therapies to treat AMD;

h. failing to conduct adequate post-marketing studies, non-clinical and clinical testing, and post-marketing surveillance and analyses to determine and subsequently communicate the safety profile and side effects associated with the use of Beovu;

i. continuing to promote the safety and effectiveness of Beovu while downplaying its risks, even after Defendant knew or should have known of the significant risks of Beovu use;

j.  failing to provide consumers and the medical community, including Plaintiff and Plaintiff's healthcare providers, with scientific data which indicated that Beovu was unreasonably dangerous due to its propensity to cause vision-related adverse events including, but not limited to, an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae; and/or

k.  failing to adequately test Beovu on patients that had a prior history of VEGF use especially in light of the plan to market precisely to that population of patients.

99.  Although Defendant knew or should have known that Beovu causes unreasonably dangerous side effects, including an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae, they continue to market Beovu, despite the fact there are safer and more or equally effective alternative therapies to treat AMD.

100.  Defendant knew or should have known that failure to exercise ordinary care, as described herein, would result in serious injury to patients, such as Plaintiff.

101.  Defendant had a post-sale duty to timely warn physicians including Plaintiff's healthcare providers, and consumers, such as Plaintiffs, about the potential risks and complications associated with use of Beovu.

102.  As a direct and proximate result of the dangerous and defective nature of Beovu Plaintiff suffered central retinal vascular occlusion and other serious eye injuries, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, and medical

care and treatment. The losses are permanent and the Plaintiff will continue to suffer the losses in the future.

### THIRD CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

103.   Plaintiff incorporates by reference paragraphs one through 78 as though fully set forth herein.

104.   Defendant's negligent material misrepresentations and omissions regarding the safety and efficacy of Beovu and of Beovu's side effects, including that concerning an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae were communicated to Plaintiffs directly through promotional materials, advertising, product inserts, and the product monograph with the intent that Plaintiff use Beovu. The safety and efficacy of Beovu was also negligently misrepresented to Plaintiff's healthcare providers with the intent that such misrepresentations would result in Beovu being prescribed and administered to Plaintiff.

105.   Defendant either knew or should have known that the material representations they were making regarding the safety, efficacy, and side effects of Beovu were false.

106.   Defendant negligently made misrepresentations and/or actively concealed, suppressed, or omitted this material information with the intention and

specific desire to induce consumers and the medical community, including Plaintiff and Plaintiff's healthcare providers, to use, prescribe, and purchase Beovu.

107.   Defendant negligently knew or should have known that Plaintiff and/or Plaintiff's healthcare providers would rely upon such material misrepresentations and/or omissions in selecting Beovu for the treatment of Plaintiff.

108.   Defendant made these material misrepresentations and/or omissions and actively concealed adverse information at a time when they, their agents and/or their employees knew or should have known that Beovu had certain defects, dangers, and characteristics that differed from what had been represented to the medical community and the consuming public, including Plaintiff's healthcare providers and Plaintiff. Those misrepresentations and omissions further include, but are not limited to, the following:

   a. Defendant failed to disclose or actively concealed data demonstrating that Beovu increased the risk of vision-related adverse events including, but not limited to, retinal vasculitis, retinal vascular occlusion, and related sequelae. Specifically, Defendant omitted from its product labeling data demonstrating a 2,312% increase in relative risk for retinal vasculitis or retinal vascular occlusion and related sequelae and misrepresented the incidence of retinal vasculitis and retinal vascular occlusion and related events as occurring in 1% of clinical trial patients rather than a minimum of 3.3% of patients. Plaintiff and his prescribing physician were misled by this in accurate information and detrimentally relied on this inaccurate information in deciding to prescribe and take Beovu;

   b. Defendants failed to include or provide adequate warnings along with Beovu regarding potential and established risks, and the nature, scope, severity, and duration of any serious side effects of Beovu use,

including, but not limited to, an increased risk of retinal vasculitis, retinal vascular occlusion, and related sequelae, when compared to other available therapies to treat AMD. Plaintiff and his prescribing physician relied on this lack of warnings to conclude that Beovu did not pose these risks when compared to other available therapies to treat AMD;

c.  Since receiving FDA approval, Novartis has encouraged ophthalmologists to switch their patients to Beovu by marketing it as requiring less frequent injections than other VEGF inhibitors used in the treatment of AMD, thereby purporting to offer greater convenience and reduce patient non-adherence. While Novartis' marketing of Beovu has been primarily directed towards convincing doctors to switch patients who have previously been treated with other VEGF inhibitors to Beovu, none of the patients included in the premarket clinical trials had ever received prior treatment with other VEGF inhibitors. Instead, the study protocols for the HAWK and HARRIER clinical trials required all enrolled patients to be treatment-naïve. Therefore, Novartis failed to perform any testing in the very patient population to which it intended, and indeed did, specifically market Beovu to after it received FDA approval. As such, Defendant promoted Beovu as a safe and effective treatment for patients with a prior history of using other anti-VEGF therapies despite the fact that the Defendant had not properly studied Beovu in that patient population in its clinical trials for Beovu. This promotion occurred as to Plaintiff's prescribing physician prior to Plaintiff being prescribed Beovu and Plaintiff's prescribing physician detrimentally relied on these representations in deciding to prescribe Beovu to Plaintiff; and

d.  Defendant failed to issue a safety communication like a Dear Healthcare Professional Letter or otherwise timely update its product labeling upon receipt of post-marketing adverse event reports involving retinal vasculitis and/or retinal vascular occlusion. Given this material omission, Plaintiff and his prescribing physician used Beovu without an understanding that these events had been reported in the post-marketing setting and therefore prescribed and used the drug without possessing this knowledge.

109.  Defendant's material misrepresentations and/or active concealment, suppression, and omissions were perpetuated directly and/or indirectly by

Defendant, its sales representatives, employees, distributors, agents and/or detail persons, through databases, printouts, monographs, product labeling and other information drafted, prepared, marketed, sold, and supplied by Defendant, its sales representatives, employees, distributors, agents and/or detail persons.

110. Defendant's material misrepresentations and/or active concealment, suppression, and omissions constitute a continuing tort.

111. Through its product inserts and other public statements, Defendant continue to misrepresent the serious potential vision-related risks and complications associated with use of Beovu.

112. Defendant had a post-sale duty to timely warn physicians including Plaintiff's healthcare providers, and consumers, such as Plaintiffs, about the potential risks and complications associated with use of Beovu.

113. Defendant negligently misrepresented the safety and efficacy of Beovu in their labeling, advertising, product inserts, promotional materials, or other marketing resources and materials.

114. If Plaintiff's healthcare providers and Plaintiff had known the true facts concerning the risks of Beovu use, in particular, the risk of vision-related adverse events and/or reactions, including, but not limited to, an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae, they would not have

prescribed or used Beovu and would have instead prescribed and used a safer alternative pharmaceutical drug or no drug at all.

115. Plaintiff and Plaintiff's healthcare providers' reliance upon Defendant's material misrepresentations were justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position of knowledge of the true facts concerning Beovu, while Plaintiff and Plaintiff's healthcare providers were not in a position to know the true facts concerning Beovu, and because Defendant overstated the benefits and safety of Beovu, and concomitantly downplayed the risks of its use, including, but not limited to, an increased risk for retinal vasculitis, retinal vascular occlusion, and related sequelae, thereby inducing Plaintiff's healthcare providers to prescribe and Plaintiff to use Beovu, in lieu of other safer alternatives, or no drug at all.

116. As a direct and proximate result of the dangerous and defective nature of Beovu Plaintiff suffered central retinal vascular occlusion and other serious eye injuries, and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, and medical care and treatment. The losses are permanent and the Plaintiff will continue to suffer the losses in the future.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT

117.   Plaintiff incorporates by reference paragraphs one through 78 as though fully set forth herein.

118.   At all times relevant hereto, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, or otherwise released Beovu into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used it, including Plaintiff.

119.   Defendant knew that Beovu posed a grave risk of harm but failed to warn of the dangerous risks associated with use and exposure to the product.

120.   Defendant was unjustly enriched as a result of their wrongful conduct, including through false and misleading marketing, promotions, and advertisements that omitted disclosure that the product presented an unreasonable risk of substantial bodily injury resulting from use.

121.   Defendant requested and received a measurable benefit at the expense of Plaintiff in the form of payment for their product.

122.   Defendant appreciated, recognized, and chose to accept the monetary benefits Plaintiff conferred onto Defendant at Plaintiff's detriment. These benefits were the expected result of Defendant acting in their pecuniary interest at the expense of Plaintiff.

123.   There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

124.   Defendant wrongfully obfuscated the harm caused by Beovu. Thus, Plaintiff, who relied on Defendant's misrepresentations of product safety, could not and did not know the effect that using Beovu would have on Plaintiff's health.

125.   Plaintiff is entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with Defendant. Due to their wrongful conduct, and ongoing knowledge of the risk of Retinal Vasculitis and/or Retinal Vascular Occlusion associated with the use of Beovu, Defendant was reasonably notified that Plaintiff would expect compensation from Defendant's unjust enrichment stemming from their wrongful actions.

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:

a.  For general damages in an amount to be proven at the time of trial;

b.  For special damages in an amount to be proven at the time of trial;

c.  For pre-judgment and post-judgment interest on the above general and special damages;

d.  For costs of this suit and attorneys' fees; and

e.  All other relief that this Court deems necessary, proper, and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury as to all issues.


Respectfully submitted,


Dated: July 22, 2021     By:     */s/ F. Jerome Tapley*
F. Jerome Tapley
FL Bar No.: 0022066
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Phone:  205-328-2200
Fax:  205-324-7896
jtapley@corywatson.com

*/s/ Jon C. Conlin*
Jon C. Conlin (asb-7024-j66c) (will seek to be admitted pro hac vice)
Elizabeth E. Chambers (asb-a63e-3521) (will seek to be admitted pro hac vice)
R. Andrew Jones (asb-0096-i11r) (will seek to be admitted pro hac vice)
Lauren S. Miller (asb-6193-v74n) (will seek to be admitted pro hac vice)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Phone:  205-328-2200
Fax:  205-324-7896
jconlin@corywatson.com
bchambers@corywatson.com
ajones@corywatson.com
lmiller@corywatson.com

*Attorneys for Plaintiff*